1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   GREGORY V. BALDWIN,

11            Plaintiff,                    No. 2:09-0711 WBS GGH P

12       vs.

13   CA. DEPT. OF CORRECTIONS          ORDER &
     AND REHABILITATION, et al.,
14                                      FINDINGS AND RECOMMENDATIONS

15            Defendants.

16   _____/

17   Introduction

18            Plaintiff is a prisoner proceeding pro se who seeks relief pursuant to 42 U.S.C.

19   § 1983 and defendants' motion for summary judgment is currently pending.  Pending before the

20   court are: 1) defendants' motion for summary judgment, filed on February 29, 2012; 2) plaintiff's

21   [cross-]motion for summary judgment, filed on March 19, 2012, to which defendants filed their

22   opposition on April 17, 2012, as well as their reply to plaintiff's opposition to defendants'

23   summary judgment motion; 3) plaintiff's second cross-motion for summary judgment filed on

24   May 18, 2012, to which defendants filed their opposition on June 4, 2012.  Although plaintiff had

25   been provided the requirements to oppose a motion for summary judgment pursuant to Rand v.

26   Rowland, 154 F.3d 952, 957 (9th Cir. 1998), in light of Woods v. Carey, 684 F.3d 934 (9th Cir.

1

1   2012),[1] decided on July 6, 2012, plaintiff was once again informed.  Plaintiff, on August 6, 2012,

2   filed supplemental documentation to oppose defendants' motion.  The court will construe

3   plaintiff's "motion for summary judgment," filed on March 19, 2012, as both an opposition to

4   defendants' motion summary judgment motion and a cross-motion for summary judgment.  The

5   filing plaintiff identified as his cross-motion for summary judgment, file-stamped May 18, 2012,

6   but by application of the mailbox rule,[2] filed on May 15, 2012, would, as defendants' note, be

7   untimely if the court so construed it, as the court had granted plaintiff an extension of time until

8   April 17, 2012, to file a cross-motion and opposition, but had permitted plaintiff until May 15,

9   2012 to file any reply.  It would also be inapposite if construed as a surreply, as defendants'

10   argue.  However, it does appear to be a reply to defendants' opposition to plaintiff's March 19,

11   2012 [cross]-motion for summary judgment.  Therefore, the cross-motion for summary judgment,

12   filed on May 18, 2012, will be deemed a reply to defendants' opposition to plaintiff's cross-

13   motion, and not a belated, additional cross-motion or inapposite surreply to defendants' summary

14   judgment motion.  With his latest, post-<u>Woods</u> supplemented opposition, plaintiff is now

15   proceeding on both an opposition and a cross-motion for summary judgment (docket # 80); a

16   reply to defendants' opposition to plaintiff's cross-motion (docket # 82); and a supplemented

17   opposition (docket # 86).  Plaintiff's supplemental opposition is largely, if not entirely,

18   duplicative of his reply.

19   <u>Motion for Summary Judgment</u>

20         Defendants move for summary judgment on the following grounds: 1) defendants

21   Fannon and Gray used force that was "reasonable, necessary, and minimal"; 2) defendant

22

23         [1] Cited in the order as <u>Woods v. Carey</u>, --- F.3d ----, 2012 WL 2626912 (9th Cir. July 6,

24   2012).

25         [2] Pursuant to <u>Houston v. Lack</u>, 487 U.S. 266, 275-76, 108 S. Ct. 2379, 2385 (1988), pro
se prisoner filing is dated from the date prisoner delivers it to prison authorities.  <u>See</u> Fed. R.
App. P. 4(c)(1); <u>Douglas v. Noelle</u>, 567 F.3d 1103, 1109 (9th Cir. 2009), holding that "the

26   <u>Houston</u> mailbox rule applies to § 1983 complaints filed by *pro se* prisoners").

"Barton did not see any officer use excessive or unreasonable force"; 3) defendants Gower and McDonald did not have any knowledge of defendants Fannon's and Gray's use of force or "of any safety concern plaintiff had"; and 4) defendants are entitled to qualified immunity.   Notice of Motion and Motion for Summary Judgment (MSJ), p. 1.

<u>Summary Judgment Standards under Rule 56</u>

Summary judgment is appropriate when it is demonstrated that there exists "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  <u>Id.</u>, at 324, 106 S. Ct. at 2553. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  <u>See</u> <u>id.</u> at 322, 106 S. Ct. at 2552.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  <u>Id.</u>, at 323, 106 S. Ct. at 2552.   In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  <u>Id.</u> at 323, 106 S. Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  <u>See</u>

1   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

2   (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

3   not rely upon the allegations or denials of its pleadings but is required to tender evidence of

4   specific facts in the form of affidavits, and/or admissible discovery material, in support of its

5   contention that the dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11,

6   106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is

7   material, i.e., a fact that might affect the outcome of the suit under the governing law, see

8   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

9   Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

10  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

11  nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

12          In the endeavor to establish the existence of a factual dispute, the opposing party

13  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

14  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

15  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

16  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

17  genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

18  56(e) advisory committee's note on 1963 amendments).

19          In resolving the summary judgment motion, the court examines the pleadings,

20  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

21  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

22  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

23  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct.

24  at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

25  obligation to produce a factual predicate from which the inference may be drawn.  See Richards

26  v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

4

(9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

On June 16, 2009, and again on October 6, 2009, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).  In addition, following the issuance of Woods v. Carey, 684 F.3d 934 (9th Cir. 2012), the court provided Rand notice once again and also permitted additional time for plaintiff to submit further evidence opposing defendants' summary judgment motion should he so choose.  The above advice would, however, seem to be unnecessary as the Ninth Circuit has held that procedural requirements applied to ordinary litigants at summary judgment do not apply to prisoner pro se litigants.  In Thomas v. Ponder, 611 F.3d 1144 (9th Cir. 2010), the district courts were cautioned to "construe liberally motion papers and pleadings filed by pro se inmates and ... avoid applying summary judgment rules strictly."  Id. at 1150.  No example or further definition of "liberal" construction or "too strict" application of rules was given in Ponder suggesting that any jurist would know inherently when to dispense with the wording of rules.  Since the application of any rule which results in adverse consequences to the pro se inmate could always be construed in hindsight as not liberal enough a construction, or too strict an application, it appears that only the essentials of summary judgment, i.e., declarations or testimony under oath, and presentation of evidence not grossly at odds with rules of evidence, need be submitted by the pro se party.

\\\\\

\\\\\

\\\\\

\\\\\

1              Plaintiff's Allegations[3]

2              Plaintiff is proceeding on his complaint, filed on March 16, 2009, against

3    defendants Officer J. Fannon; Officer M. Gray, Sergeant R. Barton; defendant Gower, Deputy

4    Warden of High Desert State Prison (HDSP); and Mike McDonald, Acting Warden of HDSP.[4]

5    The gravamen of plaintiff's complaint is that he was subjected to excessive force by defendants

6    Fannon and Gray at High Desert State Prison (HDSP) on 2/29/08, despite having been ordered by

7    a physician to be put on single cell status, pending the outcome of neck surgery, and despite

8    having been cautioned by a Mercy Hospital physician (Dr. Rahimifar) that if he were hit in the

9    head one time, he would never walk again.  Complaint, pp. 3-4.

10             Plaintiff claims that defendant Fannon told plaintiff on 2/29/08 that he would be

11   moved to the gym, but plaintiff told Fannon that, due to his severe neck injury, he would go to

12   administrative segregation (ad seg or ASU) instead.  Plaintiff was then taken in waist restraints to

13   the program office where defendant Barton told plaintiff that he did not "give a s- - t" about

14   plaintiff's neck injury and that HDSP made its own rules.  Id.

15             When plaintiff, still in waist restraints, saw that he was then being taken to the

16   gym, he stopped walking; thereafter, defendants Fannon and Gray forced plaintiff into the gym,

17   smashing his head into a door, after which he was taken to [Banner] Lassen Medical Facility

18   where a doctor told him he had suffered a severe cervical strain.  (Plaintiff notes that he has a

19   pending § 1983 action in the Ninth Circuit with respect to the accident that caused the original C-

20   2 fracture at Lancaster State Prison in 2005).  Id., at 4.

21

22          [3]  Plaintiff's claims have been set forth previously in findings and recommendations, filed
     on June 10, 2009, at pages 3-4, recommending denial of plaintiff's motion for a preliminary
23   injunction for an emergency transfer to another prison facility, which was adopted by order, filed
     on July 23, 2009.   There has been only minor modification of the prior summary of allegations,
24   e.g., by adding the names of certain defendants previously identified by plaintiff simply by job
     description.
25
          [4]  The California Department of Corrections and Rehabilitation (CDCR) was dismissed
26   from this action with prejudice by order, filed on July 14, 2009.

1    Plaintiff was told by defendant McDonald that he does not care that plaintiff was

2  "fil[]ing charges against the officers," and that he should do as he was told and he would not get

3  hurt.  Plaintiff states that he fears for his life and safety and is fearful of retaliation.  Plaintiff asks

4  for money damages from each defendant ([including defendants Gower and the warden

5  McDonald] for "let[t]ing this happen").  Plaintiff also asks for injunctive relief in the form of an

6  emergency transfer.  (Plaintiff also asks that lost time credits be restored).  Id., at 3-4.

7    Among the exhibits plaintiff attaches to his complaint are a copy of an HDSP

8  inmate appeal he filed through to the third level denial, regarding his request for a transfer and

9  appealing the incident giving rise to the instant cause of action (Complaint, pp. 17- 32); a copy of

10  a classification chrono, showing plaintiff had a classification score of 41 as of 12/26/07, and

11  noting that he was unassigned at that time due to medical concerns (Complaint, p. 33); a copy of

12  a letter directed to an Internal Affairs special agent in Rancho Cucamonga, complaining of the

13  alleged actions by defendants Fannon and Gray herein (Complaint, pp. 35-36); a copy of a

14  Disability Placement Program form, dated 6/12/08, showing plaintiff is an intermittent

15  wheelchair user, restricted to a lower bunk and no stairs (Complaint, p. 37), and a copy of

16  2/29/08 rules violation report which eventually resulted in plaintiff's being found guilty of

17  attempted battery on a peace officer (defendant Fannon, herein) in the apparent incident giving

18  rise to this cause of action in an April, 2008, disciplinary hearing, for which plaintiff was

19  evidently assessed a 150-day credit loss as well as a SHU (security housing unit) term.

20  Complaint, pp. 40 - 76.

21    Eighth Amendment Excessive Force Legal Standard

22    "[W]henever prison officials stand accused of using excessive physical force in

23  violation of the [Eighth Amendment], the core judicial inquiry is...whether force was applied in a

24  good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."

25  Hudson v. McMillian, 503 U.S. 1, 6-7,112 S. Ct. 995, 999 (1992), citing Whitley v. Albers, 475

26  U.S. 312, 106 S.Ct. 1078 (1986).  When determining whether the force was excessive, we look to

7

the "extent of the injury..., the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" <u>Hudson</u>, <u>supra</u>, at 7, 112 S. Ct. at 999.

While de minimis uses of physical force generally do not implicate the Eighth Amendment, significant injury need not be evident in the context of an excessive force claim, because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." <u>Hudson</u>, <u>supra</u>, at 9, 112 S. Ct. at 1000, citing <u>Whitley</u>, at 327, 106 S.Ct., at 1088.

<u>Failure to Protect</u>

"'[P]rison officials have a duty...to protect prisoners from violence.... .'" <u>Farmer v. Brennan</u>, 511 U.S. 825, 833, 114 S.Ct. 1970, 1976 (1994).  Prison officials must ensure not only the safety of the prison staff, administrative personnel and visitors, but also are obliged "'to take reasonable measures to guarantee the safety of the inmates themselves.'"  <u>Whitley v. Albers</u>, 475 U.S. 312, 320, 106 S. Ct. 1078, 1084 [] (1986), quoting <u>Hudson v. Palmer</u>, 468 U.S. 517, 526-527, 104 S.Ct. 3194, 3200 [] (1984).   "[A] prison official violates the Eighth Amendment when two requirements are met.  First, the deprivation alleged must be, objectively, 'sufficiently serious'....  For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." <u>Id.</u> at 834, 114 S.Ct. at 1977.  Second, "[t]o violate the Cruel and Unusual Punishments Clause, a prison official must have a 'sufficiently culpable state of mind' ... [T]hat state of mind is one of 'deliberate indifference' to inmate health or safety." <u>Id.</u>  The prison official will be liable only if "the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 837, 114 S.Ct. at 1979.

\\\\\

8

1            Plaintiff's Cross-Motion

2            Plaintiff failed to conform to Fed. R. Civ. P. 56(c) regarding "supporting factual

3    positions," or to comply with the requirement of L.R. 260 (a), that a motion [or cross-motion] for

4    summary judgment"shall be accompanied by a 'Statement of Undisputed Facts' that shall

5    enumerate discretely each of the specific material facts relied upon in support of the motion and

6    cite the particular portions of any pleading, affidavit, deposition, interrogatory answer,

7    admission, or other document relied upon to establish the fact."  Nor did plaintiff, in his

8    opposition, "reproduce the itemized facts in the Statement of Undisputed Facts and admit those

9    facts that are undisputed and deny those that are disputed, including with each denial a citation to

10   the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or

11   other document relied upon in support of that denial." L.R. 260(b), in part.  This failure to

12   follow procedure particularly burdens this court, requiring that the undersigned comb through all

13   of plaintiff's filings in order to determine whether a particular fact set forth as undisputed by

14   defendants is, in fact, undisputed.  However, such is the lot of the court in light of the re-

15   emphasis by the Ninth Circuit in Thomas v. Ponder, 611 F.3d at 1150, that pro se inmates are

16   "expressly exempted" from strict compliance with summary judgment rules; cf., Woods v. Carey,

17   684 F.3d at 940 (recognizing the burden placed on district courts by requiring Rand, supra, and

18   Wyatt[5] notice for pro se inmates contemporaneous with, respectively, the filing of summary

19   judgment and unenumerated 12(b) motions by defendants, but nevertheless insisting that, should

20   defendants fail to provide such notice, it is the court's "ultimate responsibility.").

21   Notwithstanding, the court agrees with defendants, at the outset, with respect to any cross-motion

22   for summary judgment, plaintiff has wholly failed to show entitlement to entry of judgment in his

23   favor.  See defendants' reply (docket # 81), p. 4.  Plaintiff, in reciting sections of Title 15 of the

24   California Code of Regulations regarding inmate housing and classification in his putative cross-

25

26            [5]  Wyatt v. Terhune, 315 F.3d 1108, 1120 n.14 (9th Cir. 2003).

1   motion, does indeed fail to provide any basis for summary judgment in his favor.  The wholesale

2   failure to conform to the requirements of a motion or cross-motion for summary judgment, while

3   not fatal in the context of plaintiff's opposition, renders the cross-motion completely defective.

4   As to his opposition to defendants' summary judgment motion, the court does note that all of the

5   relevant filings by plaintiff, the complaint (verified), cross-motion for summary

6   judgment/opposition, reply and supplemental opposition were filed by plaintiff under penalty of

7   perjury.

8          *Defendants Fannon, Gray and Barton*

9          Undisputed Facts

10         By review of the evidence set forth by the parties and the case file as a whole, the

11  court has determined the following facts to be undisputed.[6]  To the extent that plaintiff fails to

12  offer any evidence in the record to dispute any of defendants' undisputed facts, those facts are

13  deemed undisputed.  **1**.  Plaintiff Gregory Baldwin was transferred to High Desert State Prison

14  (HDSP) on January 24, 2008.  (MSJ, plaintiff's chronological history, attached to the

15  Declaration of Deputy Attorney General Diana Esquivel Exhibit A[7], 1 (docket # 77-7, p. 4)).  **2.**

16  When plaintiff transferred to HDSP, he was endorsed for gym housing. (MSJ, Classification CSR

17  Action Chrono, attached to Esquivel Dec. Ex. A, 2 (docket # 77-7, p. 5) - - - CDC 128-G, dated

18  Jan. 8, 2008, stating in the Comment section re: plaintiff: "HDSP-III (SNY) Gym endorsed.

19  CS=41" and stating the transfer approval would expire on May 7, 2008).  **3.** On February 29,

20  2008, defendants Fannon and Gray were the housing officers in Building 5 on Facility B at

21  HDSP, where plaintiff was housed.  (MSJ, defendant Fannon Dec. (docket # 77-3) ¶ 2; defendant

22

23         [6] The facts as set forth are primarily drawn from defendants' statement of undisputed

24  facts, but where those stated facts do not fully embrace the record (including defendants' own
    evidence) or are not completely consonant with the record before the court, the undersigned has
    modified them to reflect this.

25

26         [7] Exhibit A records from plaintiff's central file authenticated by custodian of records
    declaration appended to Esquivel Dec.'s Ex. A (docket # 77-7, p. 11).

1   Gray Dec. (docket # 77-5) ¶ 2).  **4.**  On the morning of February 29, 2008, defendant Fannon was

2   informed that plaintiff was being moved to the gym, so he went to plaintiff's cell and informed

3   him of his cell move, whereupon plaintiff became upset and stated he was not going to the gym

4   because it was not appropriate housing.  (MSJ, defendant Fannon Dec., ¶¶ 3-4; verified

5   complaint, p. 1 & Exhibit at p. 17 (Third Level Appeal Response); plaintiff's Reply (docket #

6   82), p. 2).  **5**.  Defendant Fannon informed plaintiff that he had to pack his belongings up and

7   plaintiff complied with defendant Fannon's order.  (MSJ, defendant Fannon Dec. ¶ 5; verified

8   complaint, p. 1 & Exhibit at p. 17 (Third Level Appeal Response); plaintiff's reply (docket # 82),

9   p. 2; plaintiff's Supp. Opp. (docket # 86), p. 3).  **6.** About half an hour later, defendants Fannon

10  and Gray went to plaintiff's cell, placed him in waist restraints, and escorted him to the Program

11  Office so he could talk to the Sergeant (defendant Barton) about his housing assignment.  (MSJ,

12  defendant Fannon Dec. ¶ 6, defendant Barton Dec. (Docket # 77-2) ¶ 3).  **7.**  Plaintiff was

13  wearing a soft neck brace during the escort to the Program Office.  (MSJ, defendant Fannon Dec.

14  ¶ 7; defendant Gray Dec. ¶ 4; ).  **8.** Defendant Barton was the Facility B Gym Sergeant on

15  February 29, 2008, and was supervising placement of new arrivals into the gym.  (MSJ,

16  defendant Barton Dec. ¶¶ 1-2.)  **9**. Defendant Barton met with plaintiff in the program office,

17  and informed plaintiff that he was cleared for gym housing.  Barton also informed plaintiff that

18  he (plaintiff) was required to accept the housing assignment he was given.  (MSJ, defendant

19  Barton Dec. ¶ 5.)  **10**. As a Sergeant, defendant Barton did not have the authority to change an

20  inmate's housing assignment.  A classification committee decides where an inmate will be

21  housed; that is, a dorm or a cell.  (MSJ, defendant Barton Dec. ¶ 6.)  **11.**  Defendant Barton did

22  not know plaintiff. (MSJ, defendant Barton Dec. ¶ 7.)  **12.**  Defendant Barton instructed

23  defendants Fannon and Gray to escort plaintiff to the gym, and plaintiff complied with defendant

24  Barton's order to go to the gym. (MSJ, defendant Barton Dec. ¶ 8; defendant Fannon Dec. ¶¶ 8-9;

25  defendant Gray Dec. ¶¶ 3, 5).  **13**.  During the escort to the gym, defendant Fannon walked on

26  plaintiff's right side and defendant Gray was on his left.  Both officers had a hold of plaintiff's

bicep areas.  (MSJ, defendant Fannon Dec. ¶ 10; defendant Gray Dec. ¶ 6; defendant Barton Dec. ¶ 9; Barnes Crime/Incident Report (CDCR 837-C), attached to Esquivel Dec. Ex. B, 11.)  **14.** Defendant Barton followed behind the escort. (MSJ, defendant Barton Dec. ¶ 9; defendant Fannon Dec. ¶ 9; defendant Gray Dec.¶ 5; Barnes Crime/Incident Report (CDCR 837-C), attached to Esquivel Dec. Ex. B, 11.)  **16.**  Plaintiff's aggressive manner caused another officer concern, and that officer decided to follow the escort to provide any needed assistance. (MSJ, Barnes Crime/Incident Report (CDCR 837-C), attached to Esquivel Dec. Ex. B, 11.)  **17.**  As the escort neared the entrance of the gym, plaintiff made a comment about not going into the gym, and he was agitated and upset.  He stiffened his upper body, stopped walking, and let his legs go limp. (MSJ, defendant Barton Dec. ¶ 10; defendant Fannon Dec. ¶ 11; defendant Gray Dec. ¶ 7; Barnes Crime/Incident Report (CDCR 837-C), attached to Esquivel Dec. Ex. B, 11.)  **18.** Defendants Fannon and Gray maintained a hold of plaintiff, held him up by his upper arms, turned his body to the left, and placed his upper body against the outside wall of the gym. Defendant Fannon held him against the wall by placing his right forearm across plaintiff's shoulder blades, and defendant Gray held on to plaintiff's left arm.  (MSJ, defendant Fannon Dec. ¶¶ 12-13; defendant Gray Dec. ¶¶ 8-9; defendant Barton Dec. ¶¶ 11-12; Barnes Crime/Incident Report (CDCR 837-C), attached to Esquivel Dec. Ex. B, 11.)

**19.**  Defendants Fannon and Gray ordered plaintiff to stop resisting and counseled him about escort procedures and his housing assignment.  (MSJ, defendant Fannon Dec. ¶ 12; defendant Gray Dec. ¶ 8; defendant Barton Dec. ¶ 13; Barnes Crime/Incident Report (CDCR 837-C), attached to Esquivel Decl. Ex. B, 11.)  **20.** The defendant officers did not slam plaintiff into the wall.  They did not put their hands or arms on or near his neck.  And plaintiff did not cry out or state he was injured or that the defendant officers' actions were causing him pain.  (MSJ, defendant Fannon Dec. ¶¶ 13, 16; defendant Gray Dec. ¶¶ 9, 11; defendant Barton Dec. ¶ 12.)  **21**. The defendant officers decided to put plaintiff up against the wall as a precautionary measure because of plaintiff's agitated state and resistance.  Also, placing plaintiff against the wall

prevented an escalation of the situation and protected the defendant officers for any unexpected movement plaintiff may have made, such as an attempt to head butt the defendant officers, run or bump into them, or pull away from their grasp. (MSJ, defendant Fannon Dec. ¶ 14; defendant Gray Dec. ¶ 12.) **22**. When plaintiff appeared to calm down and stated he would comply with orders, defendants Fannon and Gray continued with the escort. (MSJ, defendant Fannon Dec. ¶ 17; defendant Gray Dec. ¶ 13; defendant Barton Dec. ¶ 14; Barnes Crime/Incident Report (CDCR 837-C), attached to Esquivel Dec. Ex. B, 11.) **23**. They held plaintiff against the wall for less than a minute. (MSJ, defendant Fannon Dec. ¶ 15; defendant Gray Dec. ¶ 10; defendant Barton Dec., ¶ 13.) **24**. A couple of steps after passing through the entrance of the gym, plaintiff again stiffened his body, stated that he was not going in the gym, and tried to pull his arms out of Fannon's and Gray's grasps by moving his torso side to side. (MSJ, defendant Fannon Dec. ¶ 18; defendant Gray Dec. ¶14; defendant Barton Dec. ¶¶ 15-16; Barnes Crime/Incident Report (CDCR 837-C), attached to Esquivel Dec. Ex. B, 11.) **25**. Defendants Fannon and Gray turned plaintiff to the left, took a couple of steps, and put him up against the wall of the inside of the gym to stop his resistive actions. (MSJ, defendant Fannon Dec. ¶ 19; defendant Gray Dec. ¶ 15; defendant Barton Dec. ¶¶ 17, 19.) **26**. Defendant Gray maintained a hold of plaintiff's left arm, and defendant Fannon placed his right forearm across plaintiff's shoulder blades. Neither officer put their hands or arms on or near plaintiff's neck or neck area. (MSJ, defendant Fannon Dec. ¶ 20; defendant Gray Dec. ¶ 16; defendant Barton Dec. ¶ 18.) **27**. Defendants Fannon and Gray ordered plaintiff to calm down, and defendant Barton asked plaintiff if he would be all right if the defendant officers released him. He replied that he would be fine. (MSJ, defendant Fannon Dec. ¶ 21; defendant Gray Dec. ¶ 17; defendant Barton Dec. ¶¶ 18, 20.) **28**. Defendants Fannon and Gray held plaintiff against the wall for less than a minute, and plaintiff did not cry out in pain or state that the officers were hurting him. (MSJ, defendant Fannon Dec. ¶ 23; Gray Dec. ¶¶ 17-18; defendant Barton Dec. ¶¶ 19, 21.) **29**. When plaintiff calmed down, the defendant officers released their hold of him, and defendant Gray removed the waist restraints with defendant

1   Fannon's assistance.  (MSJ, defendant Fannon Dec. ¶ 22; defendant Gray Dec. ¶ 19; defendant

2   Barton Dec. ¶ 22.)  **30**. A few seconds after the waist restraints were removed plaintiff sat down

3   next to the wall and stated that he needed medical attention.  (MSJ, defendant Fannon Dec. ¶ 24;

4   defendant Gray Dec. ¶ 20; defendant Barton Dec. ¶ 23.)  **31.** Defendant Barton summoned

5   medical staff, who responded within a few minutes.  Medical staff evaluated plaintiff, placed him

6   on a backboard as a precautionary measure because of his complaints of neck pain, and took him

7   to the medical clinic for further evaluation.  (MSJ, defendant Barton Dec. ¶¶ 24-25; defendant

8   Fannon Dec. ¶ 25; Daniels Medical Report of Injury or Unusual Occurrence (CDCR 7219),

9   attached to Esquivel Dec. Ex. B, 26.)  **32.** Defendants Barton, Fannon, and Gray had no further

10  interaction with plaintiff after medical staff arrived.  (MSJ, defendant Barton Dec. ¶ 26;

11  defendant Fannon Dec. ¶ 26; defendant Gray Dec. ¶ 22.)  **33.** Plaintiff was taken to the prison's

12  hospital for further treatment and subsequently transferred to an outside medical facility.  (MSJ,

13  Medical Records, attached to Esquivel Dec. Ex. C, 1-2.)  **34.** Plaintiff underwent x-rays and a CT

14  scan; no fractures or soft tissue swelling were noted. The studies only showed some minor

15  pre-existing degenerative changes.  (MSJ, Medical Records, attached to Esquivel Dec. Ex. C,

16  3-6.)  **35.** Plaintiff returned to HDSP that same day.  No injuries were noted on plaintiff when

17  prison-medical staff evaluated him before he was placed in administrative segregation, and

18  plaintiff claimed to be all right.  (MSJ, Shaw Medical Report of Injury or Unusual Occurrence

19  (CDCR 7219), attached to Esquivel Dec. Ex. B, 27.)  **36**. Defendants Fannon and Gray did not

20  punch, kick, strike, hit, or use pepper spray on plaintiff, and defendant Barton did not see either

21  officer do any of these things to plaintiff.  (MSJ, defendant Barton Dec. ¶ 27; defendant Fannon

22  Dec. ¶ 27; defendant Gray Dec. ¶ 23.)  **37.**  Defendants Fannon and Gray used only that amount

23  of force necessary to maintain control of Baldwin and to stop his resistive behavior.  They did not

24  use force on Baldwin for any purpose other than to get him to comply with orders and stop his

25  combative conduct.  (MSJ, defendant Barton Dec. ¶ 28; defendant Fannon Dec. ¶¶ 28-30;

26  defendant Gray Dec. ¶¶ 24-26.)

14

1          Disputed Facts

2          Plaintiff seeks to dispute that portion of DUF 7, wherein defendants Fannon and

3   Gray are cited as having been unaware of his neck or medical conditions.  (MSJ, defendant

4   Fannon Dec. ¶ 7; Gray Dec. ¶ 4.)   Defendant Fannon declares, in addition to stating that plaintiff

5   was wearing a soft neck brace when he was escorted to the program office that while Fannon

6   does not recall plaintiff telling him of his medical condition or extent of injury that plaintiff "had

7   previously told him that he was injured at another prison."  Fannon Dec., ¶ 7.  Plaintiff has

8   repeatedly asserted, however, that he told defendant Fannon that "because of a severe neck

9   injury" he would go to administrative segregation unit (ad seg) before he would move to the gym.

10  (Verified complaint, p. 3, Reply, p. 2, Supp. Opp., p. 4).  Defendant Gray declares plaintiff "was

11  in waist restraints" and "was wearing a soft neck brace," but that Gray did not know why plaintiff

12  had on the neck brace and that he "was not aware of his medical conditions."  Gray Dec., ¶ 4.

13  Plaintiff asserts that "no one at any time" called the medical department to determine the extent

14  of plaintiff's neck injury.  (Plaintiff's Reply, p. 2).  Plaintiff directly disputes that defendant

15  Fannon was unaware of his neck injury and the reason he did not want to go to the gym, while

16  even in the case of defendant Gray, it somewhat strains credulity that he might not infer, seeing a

17  neck brace, that plaintiff might have had some sort of neck condition.

18          Plaintiff takes issue with that portion of DUF 11, wherein it is stated that

19  defendant Barton was unaware of any injury or medical condition he had.  Defendant Barton

20  declares that he does not recall plaintiff's having mentioned a pre-existing neck injury or why he

21  did not want to be housed in the gym and also does not recall plaintiff wearing a neck brace.

22  (MSJ, defendant Barton Dec. ¶ 7.)   Plaintiff, however, insists that he told defendant Barton

23  about his neck injury and that a Dr. Rahimifar at Mercy Hospital Bakersfield had ordered single

24  cell status for plaintiff pending outcome of surgery and told him that if he was hit in the head one

25  time, he would not walk again, to which defendant Barton responded that he "don't give a s- - t."

26  (Complaint, pp. 3-4; plaintiff's Reply, Appeal log HDSP, 08-01595, p. 46).  Moreover, plaintiff

15

1  points out that in the crime incident report relied on by defendants, defendant Barton stated that

2  he had identified plaintiff by his state identification card when he was escorted to the program

3  office (MSJ (docket # 77-7, p. 19); although plaintiff does not produce a copy of his state ID

4  card, stating that his current place of incarceration will not permit it, plaintiff avers that it shows

5  him wearing his neck brace.  (Plaintiff's Reply, p. 5; Supp. Opp., p. 4).  Moreover, it beggars

6  belief that defendant Barton would have been unaware of plaintiff's soft neck brace when the

7  escorting officers uncontestedly observed it.

8       In DUF 15, defendants state that it is undisputed that plaintiff seemed agitated and

9  was acting aggressively during the escort by stiffening his body and balling up his hands into

10  fists.  (MSJ, Barnes Crime/Incident Report (CDCR 837-C), attached to Esquivel Dec. Ex. B, 11.)

11  Plaintiff questions how it would be possible for either Officer Barnes or defendant Barton to

12  determine that plaintiff was balling his hands into fists if they were behind the escort.   (Supp.

13  Opp., p. 6.  )  In DUF 24, with reference to defendants' statement that plaintiff kicked his right

14  leg back at defendant Fannon, plaintiff points out that Officer Hurd in the crime incident report

15  said nothing about plaintiff having tried to kick Officer Fannon.  (Supp. Opp., p. 9; MSJ (docket

16  # 77-7, p. 37.)  Moreover, even defendant Barton notes that defendant Fannon did not observe

17  any effort by plaintiff to kick him.  (MSJ, defendant Barton Dec., ¶ 16).  Although plaintiff does

18  not directly counter DUF 28, wherein defendants Fannon and Gray maintain they held plaintiff

19  against the wall for less than a minute, and plaintiff did not cry out in pain or state that the

20  officers were hurting him, he noted that Officer Burch in the crime incident report stated that

21  plaintiff said "my neck hurts, I can't move," as defendants Fannon and Gray removed his waist

22  restraints and he sank into a sitting position.  (Complaint, p. 63;MSJ (docket # 77-7, p. 25;

23  Supp. Opp., p. 10.)

24       Plaintiff appears to take issue with DUF 25 to the extent that it is therein asserted

25  that defendants Fannon and Gray did not slam him against the wall (MSJ, defendant Barton Dec.

26  ¶¶ 17, 19).  In the second level appeal response to appeal no. HDSP-S-08-01595, attached to his

1    complaint, the interview summary of what plaintiff says occurred once he entered the gym and

2    "kind of stopped walking" contrasts somewhat with defendants' version of events:

3    > You state they then lifted you up by the arms and they smashed you
>    into the door.  Officer Fannon had his shoulder in your back.  You
4    > say all this time you had your cervical collar on and your head was
>    turned to the left, which hasn't turned that way in two years since
5    > the accident.  You state when you knew you were going to be
>    smashed up against the door and [sic] put your right foot out in
6    > front of you to soften the blow.  Barton asked you if you were
>    going to be all right if they took the waist chains off.  You said yes
7    > and you slid down the wall because of tremendous pain.  You state
>    Medical then came in and put you on a backboard, took you to
8    > Correctional Treatment Center (CTC) and then Banner.  The
>    diagnosis at Banner was that you had a severe cervical strain.  You
9    > state Barton put in his report there was no injury.

10   Complaint Exhibit, pp. 19-20, partially granted second level appeal response, dated July 31, 2008

11   (which response defendant Gower, in his declaration at ¶6 declares that he signed).

12            Plaintiff's contentions in the third level appeal response of HDSP-08-01595,

13   states with respect to his treatment at the hands of defendants Fannon and Gray:

14   > The appellant alleges that CO Fannon and CO Gray escorted him
>    in waist restraints and physically forced the appellant in the gym
15   > and smashed the appellant into a door.  The appellant now has
>    numbness in his left leg from the hip to the knee.  The appellant
16   > has been put on Disability Placement Program status for a
>    wheelchair, as of May 27, 2008, and has limited mobility, while
17   > wearing a cervical collar.

18   Id., at 17.

19            He maintains he suffered a cervical strain, which he avers takes place "when the

20   head snaps forward during as accident [or] a fall."  (Supp. Opp., pp. 6, 16, Ex. A, copy of Banner

21   Medical Center Discharge Instructions for plaintiff for Feb. 29, 2008; see also, MSJ, Medical

22   Records, Esquivel Dec. Ex. C, 1-2 (docket # 77-7, pp. 42-43 .))  Plaintiff's medical records

23   reflect that plaintiff was seen in the prison hospital on an emergency basis on Feb. 29, 2008,

24   complaining "my neck hurts," and as reported on the "Triage and Treatment Area - Progress

25   Note," the following is reported:

26   \\\\\

> The patient was going to be housed in the B-Yard Gym, he did not
> want to be housed in the Gym and resisted somewhat to the
> Security Staff and the patient claims that the Security Staff
> slammed him against the wall.  Report from Officers is that is not
> what actually happened, however the patient is complaining of
> excruciating pain, has previous he states, "neck injury from about
> 2.5 years ago again from an altercation at another prison."[8]

MSJ, Medical Records, Esquivel Dec. Ex. C, 2 (docket # 77-7, p. 43 .))

Although plaintiff was reported to be "tender over the spine are[a], when the C-collar was removed, he was found to be "in no acute distress."  Id.  Nevertheless, plaintiff was transferred to Banner Lassen Medical Center for C-spine clearance and to "rule out C-spine fracture" and "C-spine precautions" were to be continued.  Id.

With regard to DUF 34, it is undisputed that plaintiff underwent x-rays and a CT scan; no fractures or soft tissue swelling were noted.  The studies only showed some minor pre-existing degenerative changes.  (MSJ, Medical Records, attached to Esquivel Dec. Ex. C, 3-6 (docket # 77-7, pp. 44-47 .))  In that report from Banner Lassen Medical Center, the findings, following examination of "cervical spine series, 5 views" were:

> Odontoid is intact.  Vertebral body height, alignment and disc
> spaces are well maintained with very early degenerative changes
> seen as C4-C5 and C5-C-6 as visualized.  No fracture/dislocation
> or prevertebral soft tissue swelling is identified to suggest unstable
> injury.
>
> IMPRESSION:
>
> MILD PRE-EXISTING DEGENERATIVE CHANGE
>
> NO UNSTABLE INJURY RADIOGRAPHICALLY.

---

[8] Plaintiff takes great umbrage at what he calls out as an erroneous characterization of what caused the original injury.  (Supp. Opp., p. 7.)  Plaintiff is adamant that what caused his injury was not an altercation at another prison but occurred as a result of an on-the-job accident.  In support of this, he provides a copy of an May 7, 2007, "outpatient operative report" from Alvarado Hospital, referencing plaintiff's report of "an accident a few years ago."  (Supp. Opp., Ex. A, p. 23.)   Also, attached to his verified complaint is a copy of a letter from the "State Compensation Insurance Fund," dated Feb. 27, 2006, stating in part: "The Dept. of Corrections has informed us of the industrial skull, neck, right hand ring finger, little finger injury you sustained on December 12, 2005.  We are advising you that liability for this injury has been accepted."  Complaint, Ex. at p. 38.

1    Id., at 44.

2              A CT cervical spine scan revealed:

3              FINDINGS: No fracture or destructive bony lesions are present.
             There is a small posterior osteophyte at C3 and C4 centrally as well
4              as at C5 and to a lesser extent at C6 from degenerative changes.
             On the sagittal reconstructed images there are also some anterior
5              osteophytes.

6              IMPRESSION:

7              NO FRACTURE.

8              DEGENERATIVE CHANGES CERVICAL SPINE AS
             DESCRIBED ABOVE.
9

10   Id., at 45.

11             On a "notification of diagnostic test results" (form CDCR 7393), dated March 14,

12   2008, referring to "x-ray," conducted on Feb. 29, 2008, the box that is checked states: "Your test

13   results are essentially within normal limits or are unchanged and no physician follow up is

14   required."   Id., at 47.  The form is signed by a Dr. Roche and contains a hand-written note not

15   fully legible to (or interpretable by) the court.

16             In DUF 35, defendants provide evidence that plaintiff returned to HDSP that same

17   day and that no injuries were noted on plaintiff when prison-medical staff evaluated him before

18   he was placed in ad seg, and plaintiff claimed to be all right.  (MSJ, Shaw Medical Report of

19   Injury or Unusual Occurrence (CDCR 7219), attached to Esquivel Dec. Ex. B, 27.)  On that

20   report, plaintiff is reported to have said he "was pushed into the wall," and plaintiff evidently

21   complained of pain but also apparently stated "I am okay."   (Id. (docket # 77-7, pp. 38-39)).

22             Although plaintiff's evidence does not contradict what it set forth in both DUF 34

23   and 35, plaintiff, however, counters with the Medical Discharge Instructions he received from

24   Banner Lassen Medical Center he received that day (Feb. 29, 2008):

25             CERVICAL STRAIN-WITH XRAYS
             You have been diagnosed with a neck strain, also called a cervical
26             strain.  The cervical spine extends from the base of the skull to the

                                          19

top of the shoulders.  A strain is an injury of the muscles in which the muscle fibers are stretched, torn or otherwise injured.  The pain that you feel is caused by inflammation (swelling) or bruising within the muscle.  Strains should not be confused with sprains which are injuries to the ligaments which hold bones together. A cervical strain occurs when the head snaps forward during an accident or fall.  The neck muscles tighten very hard to slow the moving head.  The muscles can easily be strained with this type of action.  It is normal to experience pain over the muscles around the neck but not over the bones of the cervical spine.  The x-rays of your neck showed no evidence of broken bones.  You should apply warm moist heat (such as a warm, damp washcloth) to the injured area for 20 minutes at a time, at least 4 times per day.  Gentle massage of the injured muscles may help to relax them and ease the pain.  It is normal to experience stiffness and some pain in your neck as the result of your injury.  This pain may last for the next few days.  You do not necessarily need to return here or to the nearest Emergency Department for this type of pain.  However, you should watch for a SIGNIFICANT change or worsening of your symptoms.  You should call your physician or go to the nearest Emergency Department if [] your pain does not improve within 4 weeks or your pain is severe enough to seriously limit your normal activities.

YOU SHOULD SEEK MEDICAL ATTENTION IMMEDIATELY, EITHER HERE OR AT THE NEAREST EMERGENCY DEPARTMENT, IF ANY OF THE FOLLOWING OCCURS:
Numbness (loss of feeling) or tingling in your arms or legs.
Weakness in the arms or legs.
A feeling that your neck is unstable.
Loss of bowel or bladder control.  (Wetting or soiling yourself).
Severe or increasing pain.[9]

(Supp. Opp., Ex. A, pp. 22-23, copy of Banner Medical Center Discharge Instructions for plaintiff for Feb. 29, 2008.)

Discussion

Defendants Fannon and Gray contend that the force they used in escorting plaintiff was a minimal amount necessary to restrain plaintiff whom they reasonably perceived to be a threat and that defendant "Barton did not see any officer use excessive or unreasonable

---

[9] A hand-printed remark under these symptoms on the sheet, evidently made by plaintiff states: "I have told medical staff about all of these."

1  force." MSJ (docket # 77), pp. 7-11.  Defendants Barton, Gower and McDonald[10] maintain that

2  since defendants Fannon and Gray used reasonable force, plaintiff's failure to protect claim fails

3  as to each of them.  MSJ, pp. 11-12.  However, while plaintiff has hardly presented a lucid and

4  well-organized opposition, the questions raised with respect to whether or not defendants

5  Fannon, Gray and Barton were fully cognizant of the injury from which plaintiff suffered, which

6  they all deny, by plaintiff's statements under penalty of perjury cannot be resolved on a motion

7  for summary judgment.   The court is mindful "that at the summary judgment stage the judge's

8  function is not himself [or herself] to weigh the evidence and determine the truth of the matter

9  but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477

10  U.S. at 249, 106 S. Ct. at 2511.  Thus, it is not for this court to make a credibility determination

11  on a motion for summary judgment.  Dominguez-Curry v. Nevada Transp. Dept., 424 F.3d 1027,

12  1036 (9th Cir.  2005) ("[I]t is axiomatic that disputes about material facts and credibility

13  determinations must be resolved at trial, not on summary judgment.") [Internal citation omitted].

14              *Qualified Immunity*

15              Nor are these defendants entitled to qualified immunity.  In resolving a claim for

16  qualified immunity the court addresses two questions: (1) whether the facts, when taken in the

17  light most favorable to plaintiff, demonstrate that the officers' actions violated a constitutional

18  right and (2) whether a reasonable officer could have believed that his conduct was lawful, in

19  light of clearly established law and the information the officer possessed.  Anderson v.

20  Creighton, 483 U.S. 635, 107 S.Ct. 3034 (1987).  Although the Supreme Court at one time

21  mandated that lower courts consider these two questions in the order just presented, more

22  recently the Supreme Court announced that it is within the lower courts' discretion to address

23  these questions in the order that makes the most sense given the circumstances of the case.

24  Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808 (2009).

25

26  _____

[10] The claims against defendants Gower and McDonald, who stand in a different position then does defendant Barton, are addressed separately below.

1           In this instance, the court has determined that there is a genuine issue of material

2  fact raised as to whether or not defendants Fannon, Gray and Barton subjected plaintiff to

3  excessive force in violation of his Eighth Amendment rights which cannot be resolved on this

4  motion in light of the facts which remain in dispute.  Having so found, these defendants simply

5  do not make a persuasive argument for entitlement to qualified immunity.  As noted above the

6  evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all

7  reasonable inferences that may be drawn from the facts placed before the court must be drawn in

8  favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356.  Based on the

9  plaintiff's opposing evidence (gleaned by the court in part by painstakingly culling through all

10  the material in the file), the court finds it is reasonable to infer that these defendants were all

11  aware, or made aware, of plaintiff's neck injury, when he insists he informed them of his specific

12  medical injury and concerns and undisputedly wore a soft neck brace at the time.  If, indeed,

13  plaintiff was slammed into a wall in his apparent condition, no reasonable officer could believe

14  in the face of clearly and long established law that such conduct was lawful.  Hudson, supra, at 9,

15  112 S. Ct. at 1000, citing Whitley, at 327, 106 S.Ct., at 1088.

16                  *Defendants McDonald and Gower*

17                  Undisputed Facts

18           Again, the court has modified the DUF where necessary to accurately reflect what

19  is undisputed.

20           **38**. On March 6, 2008, plaintiff appeared before the classification committee for

21  initial review of his placement in ad seg for attempted battery on a peace officer arising from the

22  incident on February 29, 2008.  (MSJ, defendant McDonald Dec. ¶ 3; Initial ASU Classification

23  Chrono, attached to Esquivel Dec. Ex. A, 3.)  **39.** Defendant McDonald, the Chief Deputy

24  Warden for HDSP, was the chairperson of the classification committee on March 6, 2008.

25  (McDonald Dec. ¶ 2; Initial ASU Classification Chrono, attached to Esquivel Dec. Ex. A, 3.)  **40**.

26  The committee elected to keep plaintiff in ad seg pending resolution of the disciplinary report

against plaintiff for attempted battery.  (MSJ, Initial ASU Classification Chrono, attached to Esquivel Dec. Ex. A, 3.)  **41**. During the committee hearing, defendant McDonald declares that he does not recall if plaintiff complained about defendants Gray or Fannon having used excessive force on Feb. 29, 2008, or that he complained about having been improperly endorsed for gym housing.  Defendant McDonald states that it was his customary practice to address any concerns that would have been raised and that they would be reflected in the post-hearing classification chrono, but the chrono does not show plaintiff complained about officer misconduct or housing concerns.  (MSJ, defendant McDonald Dec. ¶¶ 4-6; Initial ASU Classification Chrono, attached to Esquivel Dec. Ex. A, 3.)  **42.** Before March 6, 2008, defendant McDonald did not know plaintiff and had no knowledge of plaintiff's medical condition. (MSJ, defendant McDonald Dec. ¶ 11.)  **43**. On April 24, 2008, plaintiff appeared before the classification committee that was chaired by defendant McDonald.  (MSJ, defendant McDonald Dec. ¶ 7; Classification Chrono, attached to Esquivel Dec. Ex. A, 4.)  **44.**  Plaintiff was found guilty of attempted battery on an officer arising from the incident on February 29, 2008, and the committee elected to keep plaintiff in ad seg pending review of his case by the Classification Staff Representative.  (MSJ, defendant McDonald Dec. ¶ 8; Classification Chrono, attached to Esquivel Dec. Ex. A, 4.)  **45.** Defendant McDonald has no recollection of plaintiff having complained to the committee in April 2008 about any safety concern or about unmet medical needs and he declares it his customary practice to address any such complaints and they would be reflected in the classification chrono, but the chrono does not reflect that any such concerns were raised.  (MSJ, defendant McDonald Dec. ¶¶ 9-10; Classification Chrono, attached to Esquivel Dec. Ex. A, 4.)  **46**.  Defendant McDonald was not present during the incident on February 29, 2008, and he had no knowledge of what transpired on that day until he received notice of this suit.  (MSJ, defendant McDonald Dec. ¶ 12.)  **47.** In June 2008, plaintiff's inmate appeal concerning the events of February 29, 2008, was sent to the Warden's Office for a response at the second level of review in the inmate grievance process. (MSJ, defendant Gower Dec. ¶¶ 3-5.)  **48.** The appeal

1   was assigned to Associate Warden Gower [a defendant herein] to investigate and provide a

2   response.   (MSJ, defendant Gower Dec. ¶ 3.)  **49.** After an investigation into plaintiff's

3   allegations of staff misconduct [which defendant Gower indicates he assigned to a Lt. Dharlingue

4   for investigation of the misconduct allegations], defendant Gower issued the second-level

5   response on July 31, 2008.   (MSJ, defendant Gower Dec. ¶ 6; Staff Complaint Response,

6   attached to Esquivel Dec. Ex. A, 5-7.)  **50**.   Defendant Gower declares that plaintiff's allegations

7   against defendants Barton, Fannon, and Gray were unfounded; on the response itself it is

8   indicated that "staff did not violate CDCR policy."  (MSJ, defendant Gower Dec. ¶ 7; Staff

9   Complaint Response, attached to Esquivel Dec. Ex. A, 5-7.)  **51**. Before June 2008, defendant

10   Gower did not know plaintiff and had no knowledge of his medical conditions.  (MSJ, defendant

11   Gower Dec. ¶ 8.)  **52**. Defendant Gower was not present during the incident on February 29,

12   2008, and he never spoke to plaintiff about what transpired on that day, his medical conditions,

13   or any safety concerns plaintiff may have had.  (MSJ, defendant Gower Dec. ¶¶ 9-10).

14         <u>Disputed Facts</u>

15         Plaintiff seeks to dispute defendant McDonald's representation that plaintiff did

16   not raise any safety concerns at the March 6, 2008 and April 24, 2008 classification hearings

17   defendant McDonald chaired by asserting that he has an inmate appeal dated June 4, 2008,

18   complaining about his safety concerns and that he wrote to a Special Agent Hackett on March 26,

19   2008 and he references a report by a Dr. Jenesky, dated July 17, 2008, that all occurred prior to

20   plaintiff's having been sent back to the same yard on which the incident occurred.  Supp. Opp., p.

21   12 & Ex. E; <u>see also</u>, Ex. to Complaint, pp. 35-36; and Opp., p. 13.  The "report" by E. Jenesky,

22   Ph.D, which plaintiff references is an extended interdisciplinary progress note, dated July 17,

23   2008, which records plaintiff's apparent concern at that time about being returned to the B-yard,

24   discussing what happened there (the subject incident) and reflecting his assertion that he would

25   not be going into the gym.  In his the third level inmate appeal, dated June 4, 2008, plaintiff

26   references his encounter with defendant Fannon and the March 2008, letter apparently sent to an

1  Agent Hackett reflects that plaintiff complained of his neck injury, lack of surgery and what

2  occurred on Feb. 29, 2008, and of his severe pain, but none of that shows that he shared any of

3  those concerns in the classification hearings of March and April, 2008, although it could lead to

4  at least some inference that his concerns were raised therein.

5          Discussion

6          The undersigned agrees with defendants McDonald and Gower that plaintiff has

7  failed to submit evidence that raises a genuine dispute on the issue of their awareness of the

8  February 29, 2008, incident.  MSJ, p. 12; Defendants' Reply, p. 5.  Plaintiff does indeed fail to

9  demonstrate that he suffered any harm from having been housed in B-Facility after the incident at

10  issue herein.  Id.  Plaintiff's claims against these defendants are too attenuated.  Although he

11  insists he stated to defendant McDonald in the classification committee that he had safety

12  concerns, he does not state that he explicitly expressed what those were.  Moreover, plaintiff

13  does not dispute that the classification committee meeting occurred after the incident at issue.

14          Plaintiff may claim that these defendants did not properly train with respect to

15  prison policies and procedures, but " [a] supervisor may be liable under § 1983 only if there

16  exists either "'(1) his or her personal involvement in the constitutional deprivation, or (2) a

17  sufficient causal connection between the supervisor's wrongful conduct and the constitutional

18  violation. " Jeffers v. Gomez, 267 F.3d 895, 915 (9th Cir. 2001) (internal citations omitted).

19  Although plaintiff claims that these defendants are liable for not enforcing proper policies and

20  procedures and/or for a failure to train or protect, plaintiff does not make the requisite showing.

21  Plaintiff must show that McDonald and Gower's failure to train "amounted to deliberate

22  indifference." Cannell v. Lightner, 143 F.3d 1210, 1213 (9th Cir. 1998), citing City of Canton v.

23  Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204-05 [] (1989).  In the one incident plaintiff seeks

24  to implicate these defendants for, plaintiff has failed to "raise a genuine issue of material fact as

25  to whether the training was inadequate or as to whether the inadequacy of training was the result

26  of a 'deliberate' or 'conscious' choice on the part of" either defendant McDonald or defendant

1    Gower.  Id., at 143 F.3d at 1214, citing Alexander v. City of San Francisco, 29 F.3d 1355, 1367

2    (9th Cir.1994).

3            As the court has determined that plaintiff fails to sustain a claim of a deprivation

4    of his constitutional rights as to these two defendants, the court will recommend entry of

5    summary judgment in their favor without the need to consider the issue of qualified immunity.

6    Hudson, supra, at 9, 112 S. Ct. at 1000, citing Whitley, at 327, 106 S.Ct., at 1088.

7            Conclusion

8            Because, since filing this action, plaintiff has been transferred to another prison

9    facility, the court, sua sponte, will recommend dismissal of plaintiff's claims for injunctive relief

10   as moot because when an inmate seeks injunctive relief concerning an institution at which he is

11   no longer incarcerated, his claims for such relief become moot.  See Sample v. Borg, 870 F.2d

12   563 (9th Cir. 1989); Darring v. Kincheloe, 783 F.2d 874, 876 (9th Cir. 1986).  See also Reimers

13   v. Oregon, 863 F.2d 630, 632 (9th Cir. 1988).  Plaintiff has demonstrated no reasonable

14   possibility that he will be incarcerated at HDSP at any predictable time in the future.  Nor can

15   plaintiff demonstrate a reasonable possibility that if re-transferred to HDSP at some uncertain

16   time in the future that he would be subject to the conditions of which he complains.   Moreover,

17   in having been transferred, the very injunctive relief he sought has occurred.

18           In addition, although not referenced by defendants, the court finds that any claim

19   for restoration of lost credits is barred because:

20           Federal law opens two main avenues to relief on complaints related
             to imprisonment: a petition for habeas corpus, 28 U.S.C.  2254,
21           and a complaint under the Civil Rights Act of 1871, Rev. Stat.
             1979, as amended, 42 U.S.C.  1983.  *Challenges to the validity of*
22           *any confinement or to particulars affecting its duration are the*
             *province of habeas corpus, Preiser v. Rodriguez, 411 U.S. 475,*
23           *500, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973)*; requests for relief
             turning on circumstances of confinement may be presented in a
24           1983 action.

25   Muhammad v. Close, 540 U.S.749, 750, 124 S.Ct. 1303, 1304 (2004) (per curiam)[emphasis

26   added].  Plaintiff cannot seek relief by way of this § 1983 in the form of a restoration of lost time

credits and this claim for relief must be dismissed.

Accordingly, IT IS ORDERED that plaintiff's putative second and belated cross-motion for summary judgment, filed on May 18, 2012 (docket # 82), is deemed a reply to defendants' opposition to plaintiff's cross-motion for summary judgment, filed on March 19, 2012 (docket # 80), and the Clerk of the Court is to note this in the docket entry for docket # 82.

IT IS RECOMMENDED that:

1.  Plaintiff's defective [cross-]motion for summary judgment, filed on March 19, 2012 (docket # 80), be denied as wholly deficient.

2.  Defendants' motion for summary judgment, filed on February 29, 2012 (docket # 77, be denied in part and granted in part: DENIED as to defendants Fannon, Gray and Barton and GRANTED as to defendants McDonald and Gower;

3.  Plaintiff's claims for injunctive relief be dismissed as moot, and, specifically with respect to any claim for lost time credits, that claim be dismissed as inapposite.

4.  This action proceed against defendants Fannon, Gray and Barton on plaintiff's claims for money damages only.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  DUE TO THE

\\\\\

\\\\\

\\\\\

1  EXIGENCIES OF THE COURT'S CALENDAR, THERE WILL BE NO EXTENSION OF

2  TIME FOR THE FILING OF OBJECTIONS.

3  DATED: August 16, 2012

4

5                          /s/ Gregory G. Hollows
                    UNITED STATES MAGISTRATE JUDGE
6
   GGH: 009
7  bald0711.msj

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26